[Cite as *Conaway v. Cincinnati Ins. Co.*, 2017-Ohio-8787.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**ALLEN COUNTY**

KLAY L. CONAWAY, ADM. OF
ESTATE OF DARRIN L. CONAWAY, ET AL.,

      PLAINTIFFS-APPELLANT,           CASE NO.  1-16-55

      v.

THE CINCINNATI INS. CO., ET AL.,        O P I N I O N

      DEFENDANTS-APPELLEES.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2015 0085

**Judgment Reversed and Cause Remanded**

Date of Decision:   December 4, 2017

APPEARANCES:

    *Bradley C. Warren* **for Appellants**

    *Brian A. Newberg and April C. Tarvin* **for Appellee, The Cincinnati**
        **Insurance Company**

**WILLAMOWSKI, J.**

{¶1} Plaintiffs-appellants, Kyle L. Conaway ("Kyle") and Klay L. Conaway, Administrator of the Estate of Darrin L. Conaway, deceased ("the Estate"), appeal the verdict and judgment of the Allen County Common Pleas Court determining that the defendant-appellee, Cincinnati Insurance Company ("CIC"), was not required under its business auto policy issued to Lee's Hydraulic & Pneumatic Services, LLC ("Lee's") to cover appellants' losses resulting from an automobile accident. For the following reasons, we reverse the judgment of the trial court.

{¶2} This appeal arises from a car accident which occurred on January 8, 2014, and the facts are generally undisputed. On January 8, 2014, Kyle owned Lee's and was its CEO. Oct. 21, 2015 Dep. at 11. Lee's had several employees which included Kyle's father, Darrin Conaway ("Darrin"), and Mark Schlachter ("Mark"). In January 2014, a business automobile policy issued to Lee's by CIC provided coverage for a 1999 Ford F-450 ("the truck"). No individuals were listed as named insureds on the policy, just Lee's. Kyle used the truck mainly for business, which included driving it to and from work daily. Darrin, who lived with Kyle, would also ride to work with Kyle. Kyle and his father lived in Ada, Ohio, in Hardin County, several miles from Lee's in Lima, Ohio.

{¶3} In January 2014, extremely cold and wintery weather occurred. *Id*. at 56-57, 59. At approximately 8:30 p.m. around January 6 or 7, 2014, Kyle and Darrin

left their home in the truck to fill it up with fuel for the next workday.[1]  *Id.* at 57.

As they were travelling west on State Route 30, just past State Route 235, the truck

broke down as a result of the diesel fuel freezing due to the extremely cold weather.

*Id.* at 59.  Kyle and Darrin called a towing company for assistance and were advised

that the truck could not be towed for a long time.  *Id.*  Kyle and Darrin were then

taken to Mark's home, which was nearby, by an unidentified person.  *Id.* at 61.  They

arrived at Mark's home at approximately 10:00 p.m.  *Id.* at 61.  Mark then agreed

to give them a ride home and suggested "why don't we just go back to your home

and I'll spend the night, and I'll take you in to work" the next day.  *Id.* at 62.  Mark

suggested this due to the poor weather.  *Id.* at 70.  So, Mark drove the three in his

minivan to Kyle's home.  *Id.* at 62.

{¶4} On January 8, 2014, the three set out for Lee's.  *Id.* at 71.  Mark was

driving, Kyle and Darrin were passengers in his minivan.  *Id.*  The wind pushed the

front of the vehicle to the left and Mark overcorrected.  *Id.*  An accident occurred in

which Kyle and Darrin were ejected from the vehicle.  *Id.* at 73.  Kyle was injured

and Darrin was killed.  *Id.*

---

[1] The trial court determined that the date of the breakdown was January 7, 2014, although Kyle's depositions and Ex. 4 indicate that it would have been on January 6, 2014.  The exact date of the breakdown is irrelevant as the parties agree that on January 8, 2014, the date of the accident, the truck was not operable and Mark was driving Kyle and Darrin to work.

Case No. 1-16-55

{¶5} On February 17, 2015, Kyle, individually and in his capacity as the administrator of Darrin's estate[2], filed a complaint in the trial court for his personal injuries and wrongful death of his father. Doc. 1. The complaint alleged that Kyle and Darrin (i.e. the Estate) were insureds under Lee's business auto policy with Cincinnati. *Id.* The complaint requested declaratory relief with respect to insurance coverage of Kyle's and the Estate's losses. *Id.* CIC filed its answer on May 15, 2015. Doc. 9. On January 29, 2016, CIC filed a motion for summary judgment. Doc. 29. Kyle and the Estate filed their motion for summary judgment on February 1, 2016. Doc. 31. That same day, the parties entered into a stipulation as to the use and admissibility of Cincinnati's business insurance policy in question. Doc. 32. On March 9, 2016, the trial court overruled both motions for summary judgment. Doc. 37.

{¶6} A bench trial took place on October 17, 2016. Doc. 51. On October 24, 2016, the trial court issued its Findings of Fact, Decision, Verdict and Judgment Entry in favor of CIC on the issue of coverage, thereby dismissing plaintiffs' complaint. *Id.* Kyle and the Estate then filed a timely notice of appeal. Doc. 54. On appeal, they raise the following assignment of error.

> **The trial court erred in rendering a verdict that [CIC] owes no coverage in accordance with its business auto policy provision insuring a "temporary substitute" for a covered vehicle.**

---

[2] At some point, the executor of Darrin's estate was changed to be Klay Conaway.

-4-

**{¶7}** In the sole assignment of error, Kyle and the Estate assert that the trial court erred in determining that CIC was not obligated under its insurance policy with Lee's to cover Kyle's and the Estate's losses because Kyle and Darrin were not occupying a vehicle for which coverage existed or a temporary substitute vehicle for a covered auto when the accident occurred. Any party with an interest in a written contract may obtain a declaration of rights under the contract through declaratory judgment. R.C. 2721.02. "The de novo standard of review is the proper standard for appellate review of purely legal issues that must be resolved after the trial court has decided that a complaint for declaratory judgment presents a justiciable question under R.C. 2721." *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 17. De novo appellate review means that the court of appeals independently reviews the record and no deference is given to the trial court's decision. *State v. Moore,* 3d Dist. Seneca No. 13-17-07, 2017-Ohio-4358, ¶ 7.

**{¶8}** In the sole assignment of error, Kyle and the Estate claim that the trial court erred in finding that the vehicle in which they were traveling was not a "temporary substitute vehicle" as defined in the policy. An insurance policy is a contract whose interpretation is a matter of law. *Laboy v. Grange Indemn. Ins. Co.*, 144 Ohio St.3d 234, 2015-Ohio-3308, 41 N.E.3d 1224, ¶ 8.

> **The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in**

> **its entirety and to settle upon a reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect.** *Burris v. Grange Mut. Cos.*, **46 Ohio St.3d 84, 89, 545 N.E.2d 83 (1989). Words and phrases must be given their plain and ordinary meaning "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."** *Alexander v. Buckeye Pipe Line Co.*, **53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.**

*Id.* When the provisions in a contract are ambiguous, those provisions will be construed liberally, but reasonably, in favor of the insured. *Id.* at ¶ 9.

{¶9} The question before the trial court in this case is whether the minivan in which Kyle and Darrin were passengers when the accident occurred was a "temporary substitute vehicle" under the terms of the policy. The insurance contract in question here provides coverage to a "natural person * * * for injuries that occur while 'occupying' an 'auto' for which coverage is provided in the coverage Form or a temporary substitute for such covered 'auto'." Ex. 5. The policy then requires that for a temporary substitute vehicle to be covered, the named vehicle "be out of service because of its breakdown, repair servicing, 'loss' or destruction." *Id.* The text of the policy does not define "temporary substitute".

{¶10} There is no dispute that the covered vehicle was owned by the business, that the business provided the insurance coverage, and that no individuals were named insureds on the policy, just the corporation. There is also no dispute that as CEO of the corporation, Kyle used the corporate vehicle to get to and from

work as well as in the course of the business day. Prior to the day of the accident, the vehicle was being driven to a gas station to be fueled up for the next work day. As the vehicle was being driven, the vehicle broke down and could not be driven. The vehicle had to be towed. Kyle had to call an employee of the corporation to give them a ride home and a ride to the business the next morning. The ride to work would normally have been accomplished by driving the covered vehicle. Because the covered vehicle was inoperable, Kyle was forced to use another vehicle. While riding in, i.e. occupying, the other vehicle, an accident occurred causing injury to Kyle and death to Darrin. There is no dispute that Kyle and Darrin were occupying the vehicle at the time of their injuries. The only dispute herein is whether this vehicle was a temporary substitute vehicle. This issue raises the question of whether Kyle intended to use the vehicle as a temporary substitute. A review of the record shows that Kyle was asked in his deposition what he intended. Kyle testified that he considered the minivan as a temporary substitute for the truck as it related to his getting to and from work.

> **Q. Now you indicated that [the truck] was used to take you and your father to work. Was this minivan used as a substitute to take you and your father to work?**
>
> **Mr. Newberg: Objection.**
>
> **A. Absolutely.**
>
> **Q. Okay. I'll rephrase it then. You indicated [the truck] was used to take your father and you to work?**

**A. Yes.**

**Q. Was this minivan used to take you and your father to work on January 8, 2014?**

**A. Yes, absolutely.**

**Q. Would you have been in that car, you and your father, would you have been in that car, but for [the truck] breaking down?**

**Mr. Newberg: Objection, calls for speculation.**

**Q. Go ahead.**

**A. No.**

**Q. Okay. In other words, I'll even rephrase, if [the truck] had not broken down, per your normal and customary routine, would you have been in [the truck] on January 8, 2014?**

**A. Yes.**

Aug. 23, 2016 Dep. at 41-42. Even if the trial court determined that this testimony was not credible, the surrounding facts support the intention to use the minivan as a substitute for the purpose of getting to and from work.

{¶11} Although the language of the policy does not explicitly define what is meant by a temporary substitute vehicle, we can determine the definition by looking at the plain and ordinary meaning of the language used in the contract. *Hartley v. Miller*, 3d Dist. Logan No. 8-08-33, 2009-Ohio-1923, ¶ 20. The general meaning of the terms would be a vehicle used as a replacement for a short period of time. The language of the policy does not require that the covered vehicle be unavailable

for a set time nor that there be an extensive agreement to use another vehicle before a vehicle can be designated as a temporary substitute. The insurer could have added any of these provisions if it so chose. Instead the policy merely states that the covered vehicle be out of service due to a breakdown or repair.[3] At the time of the accident, the covered vehicle was out of service due to a breakdown, was not working and had not been repaired. Thus, it was inoperable and a temporary vehicle was necessary.

{¶12} One of the standard uses of the truck was to provide transportation for Kyle and Darrin from their home to the office. Kyle testified that he used the truck to provide transportation for him and Darrin from their home to work and back, to perform service calls, and "to transport jobs". Aug. 23, 2016 Dep. at 14-15. The truck was owned by the corporation and provided to him for his use as a company vehicle. *Id*. at 18. Additionally, approximately 40% of the usage of the truck was for transporting people with only 60% used for hauling items. *Id*. at 75. Kyle indicated that he did not attempt to rent another vehicle because Mark had offered to drive him and Darrin to and from work. *Id*. at 35. Kyle indicated that if he would have rented a vehicle, it would have not been a full replacement for the truck, but

---

[3] Any alleged manifest absurdity which could possibly arise, does not arise in this case. Any manifest absurdity which could possibly arise on different facts is the result of the language chosen by the drafter of the contract. CIC could have chosen to add restrictions to the definition of "temporary substitute vehicle." It did not. Thus we will not add any restrictions.

rather just a regular vehicle to transport him and Darrin to and from work and workers to job sites. *Id.* at 70.

{¶13} A plain reading of the insurance contract indicates that if the covered vehicle breaks down, a natural person may receive coverage for injuries if they are merely "occupying" a temporary substitute vehicle. Arguably, from the facts presented and found by the trial court, Kyle and Darrin were occupying the minivan as it took them to work, a task that was normally completed by the covered vehicle. Kyle testified that he intended to use the minivan to get to and from work until the truck could be repaired. Thus, as a matter of law, the minivan was temporarily being used as a substitute for the truck, which makes it a covered vehicle pursuant to the policy. For this reason, the trial court erred in finding that CIC did not owe a duty to provide coverage. The assignment of error is sustained.

{¶14} Having found error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County is reversed and the matter is remanded for further proceedings.

*Judgment Reversed and*
*Cause Remanded*

**SHAW, J., concurs.**


**ZIMMERMAN, J., dissents.**

{¶15} The starting point in the interpretation of an insurance policy has been established in Ohio by the Ohio Supreme Court. "An insurance policy is a contract

whose interpretation is a matter of law". *Sharonville v. Am. Employers Inc. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180. And, when interpreting an insurance policy, the purpose "is to ascertain the * * * *reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect*". *Laboy v. Grange Indemn. Ins. Co.*, 144 Ohio St.3d 234, 2015-Ohio 3308 (2015), citing *Burris v. Grange Mut. Cos.*, 46 Ohio St.3d 84 (1989), overruled on other grounds. (Emphasis added). Further, in such interpretation, the "plain and ordinary" meaning of the words and phrases of the contract must be applied "unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall contents of the instrument". *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), ¶2 of syllabus. In the case before us, the majority's determination that Mark Schlachter's minivan was a "temporary substitute vehicle" is a manifest absurdity.

{¶16} I do not take lightly calling the majority's interpretation of the Cincinnati policy a "manifest absurdity". Those words are harsh. However, the majority's reasoning (that Mark's vehicle was Kyle's temporary substitute vehicle) has resulted in the jurisprudence of this Court that *any*, yes *any*, vehicle that *Kyle intended* to use "as a substitute for the purpose of getting to and from work" would meet the definition of a substitute vehicle. (See ¶10, majority opinion). Thus, had Kyle ridden to work that day via Uber or Lyft, by a taxi or bus, if he hitch-hiked a ride or even if he stole a vehicle, as long as it was *his intention* to use the vehicle as

a substitute to go to work, such vehicle would be a temporary substitute vehicle according to the majority's logic.

{¶17} On the other hand, the trial court's analysis of the issue drilled deeper by differentiating between the "use" of a vehicle and the "occupancy" of it as a passenger in its determination that Mark's minivan was not Kyle's substitute vehicle. In its decision, the trial court cited *Boxler v. Allstate Ins. Co.*, 9th Dist. Summit No. 14752 (1991), a 9th District Court of Appeals case that involved an issue analogous to that presented here. Relying on *Boxler*, the trial court concluded, and I agree, that Kyle and Darrin's "use" of Mark's vehicle was limited to that of a passenger. As such, the trial court found that "there is no evidence that Kyle ever had permission to use or occupy Mark's minivan as anything other than as a passenger * * *". (Pg. 8, Trial court's judgment entry). Stated clearer, Mark as the owner of the "temporary substitute vehicle", not Kyle, possessed the authority to define the scope of the permissible use of his vehicle.

{¶18} Thus, the trial court correctly determined that in order for Kyle to "use" Mark's minivan, Mark's permission was required[4]. Kyle's intention to "use" Mark's vehicle as a substitute vehicle while riding as a passenger in it is irrelevant and of no consequence. As noted in *McCall v. State Farm Mut. Auto. Ins. Co.*, 9th Dist. Summit No. 23601, 2007-Ohio-5109, "use" is generally defined as "the

---

[4] Please see Cincinnati Business Auto Insurance Policy (Doc. 32), specifically "Business Auto Coverage Form Section 1, ¶C(3).

privilege or benefit of using something". Mark only gave Kyle a ride to work, not the benefit or privilege of using it.

**{¶19}** Therefore, I respectfully dissent.

/jlr